# ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

NOV 1 0 2010

CLERK, U.S. DISTRICT COURT

By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTEL E. CONWELL,<br>PLAINTIFF, | § § § | |
| v. | § § | CIVIL ACTION NO. 4:09-CV-656-A |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br>DEFENDANT. | § § § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

## FINDINGS AND CONCLUSIONS

### A.    STATEMENT OF THE CASE

Plaintiff Christel Conwell ("Conwell") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits under Title

II of the Social Security Act ("SSA"). In April 2007,[1] Conwell applied for disability insurance

---

[1] Conwell had previously filed applications for disability insurance benefits and supplemental security income ("SSI") benefits in February 2006. (Tr. 11, fn. 1.) Conwell's application for SSI was denied for financial reasons and Conwell did not appeal this decision. (*Id.*) Consequently, the ALJ found no reason to reopen the SSI application. (*Id.*)

1

benefits alleging that she became disabled on November 20, 2004.[2] (Transcript ("Tr.") 10-11. *See* Tr. 81-84, 124.) Her applications were denied initially and on reconsideration. (Tr. 11.) The ALJ held a hearing on September 26, 2008 and issued a decision on December 3, 2008 that Conwell was not disabled. (Tr. 11, 8-18.) Conwell filed a written request for review, and the Appeals Council denied her request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1-4.)

B.      STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and numerous regulatory provisions govern disability insurance. *See* 20 C.F.R. Pt. 404 (disability insurance). The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of

---

[2] Conwell's insured status for disability insurance benefits expired on June 30, 2007. (Tr. 12.)

Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis,* 837 F.2d at 1383.

C.    ISSUES

    1.  Whether the ALJ applied the correct legal standard in weighing the treating source opinion.

    2.  Whether the ALJ improperly evaluated Conwell's credibility.

    3.  Whether the ALJ erred in applying the medical-vocational guidelines at Step Five instead of relying on the testimony of the vocational expert.

D.    ADMINISTRATIVE RECORD

    1.  Relevant Treatment History[3]

        a.  Treating Physician, Kelly Boulden, M.D. ("Boulden")

Boulden began treating Conwell in February 2007 at the Fibromyalgia & Fatigue Center ("Center").[4]  (Tr. 186.)  Boulden noted no significant changes had occurred since Conwell's previous examinations at the Center and indicated that Conwell continued to have 13 of 18 positive tender points.  (*Id.*)  Boulden diagnosed Conwell with chronic fatigue immunodeficiency syndrome ("CFIDS") and fibromyalgia.  (*Id.*)

In a letter dated February 18, 2007 and addressed "To Whom It May Concern," Boulden reported that Conwell was diagnosed with CFIDS and fibromyalgia, which she had been suffering from since the fall of 1996.  (Tr. 185.)  Boulden stated that Conwell was first evaluated

---

[3] The Court will only review the treatment history that is relevant to the issues before the Court.

[4] Conwell first sought treatment from the Center in 2005 and was initially treated by Larry Sharp, M.D. ("Sharp") in 2005 and 2006 before Boulden began treating Conwell. (*See, e.g.*, Tr. 196-202.) Sharp found in March 2005 that Conwell had a rash, seven tender points out of twenty-one, an abnormal pupil response, notched tongue, swollen nose, cold skin, longitudinal fingernail lines, cold hands, bloated abdomen, varicose veins, and dry and swollen heels. (Tr. 201-02.) He diagnosed her with chronic fatigue immune deficiency syndrome. (Tr. 202.) In April 2005, Sharp noted that Conwell was feeling much better but that she still suffered from anxiety and fatigue. (Tr. 200.) He diagnosed her with a "low thyroid." (*Id.*) In June 2005, Sharp recorded that Conwell was not sleeping well and had a sore throat. (Tr. 199.) Sharp examined Conwell again in September 2005, noting that she was experiencing some negative side effects from some of her medications. (Tr. 197; *see also* Tr. 196.)

at the Center in March 2005 and was found to have a scalloped tongue, longitudinal nail lines, abnormal papillary response, and positive seven of eighteen tender points. (Tr. 185.) Boulden reported that subsequent blood testing "revealed abnormal free T3 to Reverse T3 ratio which confirmed thyroid dysfunction and a low AM free coritsol [sic] level confirming adrenal dysfunction." (*Id.*) Boulden indicated that in the last year Conwell had been unable to work regularly due to muscle pain, stiffness, concentration problems, fatigue and headaches. (*Id.*) Boulden also reported that she had last examined Conwell on February 13, 2007 and her tender points had worsened from seven to thirteen out of eighteen. (*Id.*) Boulden noted that Conwell had tried numerous medications and supplements but was unable to tolerate them due to her sensitive system. Boulden opined, "I anticipate that [Conwell] will be unable to work for at least the next one year." (Tr. 185.)

On March 29, 2007, Boulden again diagnosed Conwell with CFIDS and fibromyalgia and noted that Conwell was experiencing pain in her left shoulder. (Tr. 182.) At her next visit to Boulden on May 21, 2007, Conwell reported that her "PMS has been extreme" and she was experiencing fatigue. (Tr. 181.) Boulden indicated there were no significant examination changes. (*Id.*)

Boulden referred Conwell to Steve Casper ("Casper"), a non-physician, for a Functional Capacity Evaluation ("FCE"). (*See* Tr. 203-209, 211.) On July 30, 2007, Casper evaluated Conwell and stated that, based upon Conwell's efforts during the test, she would be able to function at "a physical level of medium." (Tr. 211.) Casper noted, as the FCE progressed, that Conwell "appeared to be more uncomfortable, frustrated, tired, and stressed" and "gave good effort during the FCE." (Tr. 211-12.)

On July 25, 2007, Conwell complained of fatigue, back pain, and muscle pain, and Boulden again noted that there were no significant changes from the previous examination. (Tr. 178.) On August 6, 2007, Boulden completed a Multiple Impairment Questionnaire ("Questionnaire") in which she diagnosed Conwell with CFIDS and fibromyalgia. (Tr. 188; *see* Tr. 188-95.) Boulden indicated that she treated Conwell every six to eight weeks, with the first treatment being on February 13, 2007, and had most recently treated Conwell on July 25, 2007. (Tr. 188.) Boulden further stated that Conwell had thirteen of eighteen tender points and her primary symptoms were "widespread body pain, stiffness, impaired concentration, unrefreshing sleep, daytime fatigue, gastrointestinal disturbances, [and] frequent sore throat." (Tr. 188-89.) Boulden also noted that Conwell's prognosis was "fair" and her level of pain was seven on a scale of zero to ten. (Tr. 188, 190.)

In the Questionnaire, Boulden opined that Conwell had the residual functional capacity ("RFC") to do the following: (1) sit only three hours in an eight-hour workday and must be able to get up and move around every hour for fifteen minutes; (2) stand or walk zero to one hours in an eight-hour workday and not stand or walk continuously; and (3) occasionally lift up to ten pounds and carry up to five pounds. (Tr. 190-91.) Boulden further found that Conwell was significantly limited (but not completely precluded) in her ability to grasp, turn, and twist objects and was essentially precluded from using her arms for reaching, including reaching overhead. (Tr. 191-92.) Boulden also opined that: (1) Conwell's symptoms were likely to increase if she were placed in a competitive work environment; (2) Conwell's pain, fatigue, or other symptoms frequently interfered with her attention and concentration; and (3) Conwell was prone to infections due to her poor immune function. (Tr. 192-94.) Boulden further stated that Conwell

6

would need to take unscheduled breaks about every hour during an eight-hour workday and would be absent for work, on average, more than three times a month. (Tr. 193-94.) Boulden reported that Conwell began having symptoms in 1996 and began her treatment at the Center in March 2005. (Tr. 194; *see* Tr. 196-202, 226-29.)

On August 7, 2007, Boulden wrote a second letter addressed "To Whom It May Concern." In the letter, Boulden diagnosed Conwell with CFIDS, fibromyalgia, hypothyroidism, adrenal insufficiency, endocrine disorder, insomnia, and irritable bowel syndrome and stated that Conwell had been suffering with the symptoms of these impairments since the fall of 1996. (Tr. 179; *see* Tr. 179-80.) Boulden noted that Conwell had symptoms of muscle pain, stiffness, concentration problems, fatigue, and headaches and stated that she could complete the essential functions of life "only four days out of thirty." (Tr. 179.) Boulden reported that Conwell was first evaluated at the Center in March 2005, where "she was found to have a scalloped tongue and longitudinal nail lines suggesting thyroid dysfunction," an abnormal papillary response suggestive of adrenal dysfunction, and her "tender point exam was positive for seven of eighteen tender points." (Tr. 179.) Boulden further stated that on February 13, 2007, Conwell's tender point examination had worsened to thirteen of eighteen tender points, and "she does seem to be following a declining path." (Tr. 180.)

On October 18, 2007, Conwell complained to Boulden that her eye was twitching and she had pain in her shoulders and neck. (Tr. 177.) On February 7, 2008, Conwell complained of increased pain and headaches. (Tr. 175-76.) Thereafter, on March 25, 2008, Conwell reported that her pain was better, and Boulden again diagnosed Conwell with CFIDS and fibromyalgia. (Tr. 246.)

7

On May 19, 2008, Boulden completed a Fibromyalgia Impairment Questionnaire ("FIQ")
in which she indicated that Conwell did not meet the "American Rheumatological criteria" for
fibromyalgia and diagnosed Conwell with CFIDS, generalized anxiety, and hypothyroidism.
(Tr. 237; *see* Tr. 237-242.) Boulden indicated that she treated Conwell every three months, with
the first treatment being on February 13, 2007, and had most recently examined Conwell on
March 25, 2008. (Tr. 237.) Boulden further noted that Conwell suffered from fatigue, stiffness
of her whole body, headaches, impaired concentration, and intermittent pain in the shoulders,
and she indicated that Conwell's prognosis was poor. (Tr. 237-38.) Boulden rated Conwell's
daily stiffness as ten on a zero to ten-point scale and reported that Conwell had changed
medications in an attempt to lessen her symptoms and relieve the side effects from her previous
medications. (Tr. 239.)

In the FIQ, Boulden opined that since March 2005 Conwell could: (1) sit only three hours
in an eight-hour workday and should be able to get up and move around every hour for fifteen
minutes; (2) stand or walk zero to one hours in an eight-hour workday and not stand or walk
continuously; and (3) occasionally lift and carry up to ten pounds. (Tr. 240-42.) Boulden also
stated that Conwell (1) was not able to push, pull, kneel, bend, or stoop; (2) would need to take
unscheduled breaks for fifteen to thirty minutes every day; and (3) would be absent from work,
on average, more than three times a month. (Tr. 241-42.) Boulden indicated that Conwell was
capable of low stress jobs and that emotional factors did not contribute to her symptoms and
functional limitations. (Tr. 240-41.)

Conwell was again seen by Boulden on July 23, 2008, and progress notes indicate
Conwell's pain was unchanged. (Tr. 244-45; 250-51.) When Conwell returned on December 4,

2008, she reported that she was feeling very depressed, extremely tired, and her pain had worsened. (Tr. 248-49.) Boulden again diagnosed Conwell with fibromyalgia and CFIDS. (*Id.*)

On February 25, 2009, Boulden completed another Questionnaire in which she diagnosed Conwell with fibromyalgia, chronic fatigue syndrome, Lyme disease, depression, and anxiety. (Tr. 252; *see* Tr. 252-59.) Boulden stated that Conwell had first been seen at the Center on March 28, 2005, was first seen by Boulden on February 13, 2007, and was seen by Boulden approximately every six months, with the most recent visit being on December 4, 2008. (Tr. 252.) Boulden opined that Conwell's prognosis was poor and indicated that Conwell was suffering from "muscle pain, stiffness, unrefreshing sleep, daytime fatigue, headaches, stomach disturbances, and impaired concentration." (Tr. 252-53.) Boulden reported that Conwell had thirteen of eighteen tender points and that Conwell was not able to tolerate any pain medication due to "GI complaints/distress." (Tr. 253-54.)

In the February 2009 Questionnaire, Boulden opined that Conwell could: (1) sit for a total of two hours and stand or walk zero to one hours in an eight-hour work day and must get up and move around for ten minutes every thirty minutes; (2) frequently lift up to ten pounds; and (3) occasionally carry up to ten pounds. (Tr. 254-55.) Boulden further opined that: (1) Conwell would need to take unscheduled breaks at unpredictable intervals, approximately hourly, during an eight-hour workday, for fifteen minutes at a time; (2) she would miss work more than three times a month as a result of her impairments or treatment; and (3) she was prone to infections due to her lowered immune function. (Tr. 257-58.) Boulden noted that Conwell was taking Xanax and Doxycycline but had stopped taking other medications because they upset her stomach. (Tr. 256.) Boulden stated that Conwell's pain, fatigue, and other symptoms were

severe enough that they constantly interfered with her attention and concentration and Conwell had depression and anxiety that contributed to her symptoms and functional limitations. (Tr. 257.)

On February 26, 2009, Boulden wrote another letter addressed "To Whom It May Concern" in which she repeated most of the findings from her August 7, 2007 letter. (Tr. 260-61; *see* Tr. 179-80.)

b. Frank Carrington, M.D. ("Carrington")

Carrington examined Conwell on April 7, 2006 for her annual gynecological examination. (Tr. 138-139.) Carrington noted that Conwell had been experiencing "occasional episodes of hot flashes and difficulty with being weak and tired" and had been previously diagnosed "as having possible chronic fatigue syndrome with positive Barr-Eppstein [sic] virus and also a positive for mycoplasma pneumonia." (Tr. 138.) Carrington also stated that Conwell was considering another pregnancy. In the "Assessment/Plan" section of his treatment notes, Carrington opined:

> The exact etiology of her hot flashes appears uncertain, as her menstrual cycles and periods have remained regular and would appear to be ovulatory. The patient was also advised that she should definitely find out what her chronic fatigue situation and problems are before her husband invests in a vasectomy reversal, as she also needs to know the risks associated with pregnancy before deciding to pursue that route.

(Tr. 138.)

c. State Agency Medical Consultants ("SAMCs")

In a Physical Residual Functional Capacity Assessment ("PRFC") dated June 28, 2007, Eugenia Goodman, M.D., a SAMC, diagnosed Conwell with "chronic fatigue immune

dysfunction syn[drome]" and opined that Conwell had the ability to do the following: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; and (3) stand and/or walk and sit for a total of about six hours in an eight-hour workday. (Tr. 140-47.) Goodman also opined that Conwell had the unlimited ability to push and/or pull and did not have any postural, manipulative, visual, communicative, or environmental limitations. (Tr. 141-44.) The PRFC was affirmed by Roberta Herman, M.D., also a SAMC, on September 21, 2007. (Tr. 173.)

      d. <u>Other Relevant Evidence</u>

A Western Blot laboratory test taken on March 30, 2005 indicated that Conwell tested positive for Lyme disease. (Tr. 171-72.) In addition, another laboratory test dated June 6, 2005 suggested that Conwell had a "past Epstein-Barr virus infection." (Tr. 158.) On June 15, 2006, Conwell underwent a cardiopulmonary exercise test pursuant to a referral from Sharp. (Tr. 214-24, 226.) During the test, Conwell obtained a max METS score of 3.4, which indicated a "severe impairment of the whole person" and a "poor prognosis." (Tr. 214.)

2. <u>ALJ Decision</u>

The ALJ, in his December 3, 2008 decision, noted that Conwell met the disability insured status requirements under Title II of the SSA from November 20, 2004, the alleged onset date of disability, through June 30, 2007, the date she was last insured for disability insurance benefits under Title II. (Tr. 17.) He stated that Conwell had not engaged in any substantial gainful activity since November 20, 2004. (*Id.*) He further found that Conwell had the severe impairments of chronic fatigue syndrome, immune dysfunction syndrome, and hypothyroidism. (*Id.*; *see* Tr. 12.)

Next, the ALJ held that none of Conwell's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 16-17.) As to Conwell's subjective complaints and credibility, the ALJ stated:

I find that the objective medical evidence establishes that claimant had medically determinable, severe impairments throughout the critical period that were capable of producing the type of subjective complaints she expresses. The nexus test is satisfied and I evaluated the intensity, persistence and adverse affects of the subjective symptomology pursuant to 20 CFR 404.1529 and SSR 96-7p as I determined claimant's residual functional capacity and work-related functional limitations.

Evaluation of the Subjective Complaints: Ms. Conwell testified she has had chronic pain since even before the alleged onset date and it strikes at random times in different parts of her body. Claimant added her thighs and hips are frequent targets, with pain and stiffness deep into the joints, and fatigue is [a] constant problem, although some days are better than others. She stated she can sit for two to three hours, but she moves around and stands or changes postures, but she cannot stand for very long and she has to rest after walking a couple of blocks. Claimant previously reported that all her exertional activities and strenuous postural movements, even using her hands, were aggravating and she also had headaches and flu-like symptoms. She added that any physical or mental activity made the problems worse and she testified she did the dishes and some household chores, but her husband did the heavier chores, such as vacuuming and mopping, and, while she shopped, that was tiring and she had to rest, but she acknowledged she still drives.

. . . [S]he testified she takes general care of the home and her daughter, now eight years old, and she has been a Bible study volunteer doing home studies for several years. She added that the study session[s] last about one-half hour, then she goes home to rest, and, while she usually puts in about twelve hours per week, but the activity is not constant and she testified she had not volunteered since July 2008 except for one day the week before the hearing.

Claimant has taken a thyroid medication and a progestin medication for hormonal imbalance at most times since her application, as well as vitamins, minerals and natural supplements, which can cause such adverse side effects as anxiety, drowsiness and irritability. At the hearing, Ms. Conwell testified the thyroid medication can cause palpitations and, despite the medication-related anxiety, she only takes Xanax once a week. She added that her system is

12

sensitive to medication and she prefers to control the impairments as best she can by nutrition, diet, and mild exercises.

When assessing impairment severity and secondary functional limitations, I evaluated claimant's testimony and other statements regarding daily activities, restrictions and symptoms, but I considered several factors and they are not controlling. In addition to the testimony and objective medical facts/opinions, I considered other relevant factors, including but not limited to (1) claimant's daily activities; (2) the location, duration, frequency and intensity of her subjective complaints; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side-effects of medication; (5) the prescribed treatment regimen; and (6) any other palliative measures she may use. 20 CFR [§] 404[.]1529 and SSR 96-7p.

(Tr. 12-13 (internal citations and footnotes omitted).) The ALJ further found that Conwell's "testimony and other statements regarding her subjective complaints and functional limitations were generally credible, but her testimony, the objective medical evidence and reasonable inferences therefrom does not support the conclusion that she was incapable of performing any level of sustained work activity between the alleged onset date and the date her insured status lapsed." (Tr. 17.)

As to Conwell's RFC, the ALJ opined that Conwell had the "exertional capacity for the sustained performance of a full range of sedentary work duties." (Tr. 15 (internal citations omitted); *see also* Tr. 17.) In reaching this conclusion, the ALJ went through the medical evidence in the record, stating:

I am aware that, on August 06, 2007 and May 19, 2008, Dr. Kelly D. Boulden of the Fibromyalgia & Fatigue clinic completed . . . impairment questionnaires furnished by claimant's attorney and stated that claimant does not meet the criteria for fibromyalgia, but she listed the diagnoses as chronic fatigue and immune dysfunction syndromes, with anxiety and hypothyroidism. The physician noted that claimant had been followed at the clinic since March 2005, even though she did not assume [c]are until February 2007, and opined that her patient was able to perform a full range of even sedentary work duties and, on the

May 2008 form, she listed March 28, 2005 as the date of the present level of severity.

Dr. Boulden also wrote . . . "to whom it may concern" letters dated February 18 and August 07, 2007 and, after reciting the subjective complaints, referred to a June 15, 2006 exercise ergometry evaluation as an additional basis for her opinion. However, I am not bound to accept even a treating physician's conclusion as to functional capacity or disability, particularly when the opinion is not supported by detailed, clinical diagnostic evidence. The documents were not prepared for legitimate medical purposes of diagnosis or treatment, the physician did not relate the suggested limitations, which are remarkably similar to claimant's testimony, to any particularly [sic] diagnostic test or clinical observation and, although the physician stated that claimant's condition had deteriorated on the second questionnaire, the suggested limitations did not vary between the two forms, factors that detract from the overall value of the statement. Additionally, no other physician has opined that claimant labors under such stringent restrictions as Dr. Boulden proposed, thus isolating this opinion from the other sources.

I also considered the non-binding functional capacity proposals, with brief, explanatory rationales, issued by the DDS physicians reviewing this claim at the lower administrative levels . . . . The DDS reviewers acknowledged the severity of the underlying impairments and suggested that claimant had the exertional capacity for only relatively less strenuous light exertion work activities. Based on my independent review on all the evidence before me, including the additional evidence not available to the DDS reviewers, I find that the DDS proposals are not supported by the evidence, but I agree that the evidence dos [sic] not support the conclusion that claimant has debilitating impairments.

There is no indication that Dr. Boulden is aware of the entire body of medical evidence in this case. One of the two March 29, 2005 Western Blot tests for Lyme disease was positive and Epstein-Barr virus panel was consistent with an old infection, but the rest of the comprehensive tests, including thyroid and liver functions, were generally within normal limits. Dr. Frederick L. Carrington, an obstetrician/gynecologist, conducted the annual exam April 07, 2006 and the principal observation was a recent history of unexplained hot flashes, a symptom not without a significant work-related impact. The physician was aware of the chronic fatigue syndrome diagnosis and positive Lyme disease test, but he noted that claimant was considering another pregnancy, a condition not consistent with a debilitating physical impairment.

Dr. Larry Sharp of the clinic examined claimant March 28, 2005 and noted that she had no cardiovascular or respiratory abnormality and her deep tendon

reflexes were symmetrical, but there were no other observations relating to orthopedic, neuromuscular, sensory, or coordination abnormalities or deficits (the more recent, post-June 30, 2007 notes of 2008 are consistent with the critical period records). The records show that claimant has had alternating periods of feeling better and flare-ups and, that the positive trigger points have increased, but the notes lack clear, explicit objective observations and findings necessary to support the proposed limitations and restrictions. I am aware that the June 15, 2006 pulmonary function study FEV1 and FVC results were reduced, but the values were far short of Listing-level severity and she achieved 3.4 METS, an exercise capacity not inconsistent with sedentary duties. Claimant attended a functional capacity evaluation arranged by Dr. Boulden on July 30, 2007 and Steve Casper, the evaluator, noted that she complained of pain and fatigue and became more uncomfortable and frustrated during the tests, but she put forth good effort and performed at the medium exertion level.

There are no indicia of intractable pain, such as uunexplained [sic] weight change, disuse muscle atrophy or guarding, blood pressure spikes or spells of rapid breathing or tachycardia, or premature aging and claimant did not undertake any lifestyle adaptations or home environment alterations to accommodate the impairment-driven restrictions she describes in the critical period. Claimant has relied on conservative care, with no formal physical therapy or narcotic-analgesic pain medication, and, despite the impairments, she engages in a fairly wide range of household chores and daily activities.

(Tr. 14-15 (internal citations omitted).)

As to Conwell's mental impairments, the ALJ found that Conwell "did not at any relevant time have a mental impairment, neither singly nor in combination, that had more than a minimal effect on her ability to perform either her activities of daily life or basic work activities." (Tr. 16.) He further stated that "[c]laimant did not have a severe mental impairment in the critical period and there were no work-related mental limitations." (*Id.*) The ALJ opined, based on his RFC assessment, that Conwell was not able to perform her past relevant work. (Tr. 16, 18.) However, the ALJ, based on the Medical-Vocational Guidelines, found that there were a significant number of jobs in the national economy that Conwell could perform; thus, she was not disabled. (Tr. 16-18.)

15

E.   DISCUSSION

   1.  Evaluation of Treating Physician's Opinion

Conwell claims, in essence, that (1) the ALJ erred when he failed to give controlling weight to the opinion of Boulden, Conwell's treating physician, without applying the required factors in 20 C.F.R. § 404.1527(d)(2), and (2) there is not substantial evidence supporting the ALJ's rejection of Boulden's opinion in determining Conwell's RFC. (Pl.'s Br. at 11-14.) The defendant, on the other hand, argues that the ALJ properly considered Boulden's opinion and did consider the factors set forth in 20 C.F.R. § 404.1527(d). (Def.'s Br. at 4-6.) The defendant claims that the ALJ properly rejected the opinion of Boulden, choosing instead to rely on other evidence in the record, including the opinion of Carrington. (Def.'s Br. at 7-9.)

Controlling weight is assigned to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). *See also* 20 C.F.R. § 404.1527(e). Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See* 20 C.F.R. § 404.1527(e); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)." *Newton*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original). Under the statutory analysis of 20 C.F.R. § 404.1527(d), the ALJ must evaluate the following: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d); *see also* Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).[5]

In determining that Conwell had the RFC to perform sedentary work, the ALJ reviewed the evidence in the record, including the opinions of Boulden. (Tr. 13-15.) The ALJ, however, chose to reject Boulden's opinion for the following reasons: (1) the ALJ is not bound to accept a treating physician's conclusion as to functional capacity or disability when the opinion is not supported by detailed, clinical diagnostic evidence; (2) the documents prepared by Boulden were

---

[5] Pursuant to *Newton*, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 404.1527(d) *only* if there is no other reliable medical evidence from another *treating or examining* physician that *controverts* the treating specialist. *See Newton v. Apfel*, 209 F.3d 448, 455-57 (5th Cir. 2000). An ALJ does *not* have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507-11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in *Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.").

not prepared for legitimate medical purposes of diagnosis or treatment and Boulden "did not relate the suggested limitations, which are remarkably similar to claimant's testimony, to any particularly [sic] diagnostic test or clinical observation;" (3) although Boulden stated that claimant's condition had deteriorated from the first Questionnaire dated August 6, 2007 to the FIQ dated May 19, 2008, the suggested limitations did not vary between the two forms, factors that detracted from the overall value of the statement; (4) no other physician had opined that Conwell was so severely restricted in her ability to function; (5) there was no indication that "Boulden is aware of the entire body of medical evidence in this case;" (6) there "are no indicia of intractable pain, such as unexplained weight change, disuse muscle atrophy or guarding, blood pressure spikes or spells of rapid breathing or tachycardia, or premature aging and claimant did not undertake any lifestyle adaptations or home environment alterations to accommodate the impairment-driven restrictions she describes in the critical period;" (7) "records show that claimant has had alternating periods of feeling better and flare-ups and, that the positive trigger points have increased, but the notes lack clear, explicit objective observations and findings necessary to support the proposed limitations and restrictions;" and (8) claimant has relied on conservative care and engaged in a wide range of household chores and daily activities. (Tr. 14-15.)

Based upon the above review of the ALJ's decision to reject Boulden's opinion, the Court finds that the ALJ did follow the statutory analysis before rejecting such opinion. Although the ALJ did not make an explicit finding as to each of the factors in 20 C.F.R. § 404.1527(d), his discussion of Boulden's opinions shows that he considered each factor in reaching his decision to reject Boulden's opinions. As to factors one and two, it is apparent that

the ALJ was aware of the examining relationship and treatment relationship between Boulden and Conwell as he specifically indicated that Boulden had assumed care of Conwell in February 2007 and acknowledged, when referring to Boulden's opinions, that he was not bound to accept a treating physician's conclusion as to functional capacity or disability under certain circumstances. As to the remaining factors, the ALJ detailed his reasons for finding Boulden's opinion unsupportable and inconsistent with the other evidence in the record.[6]

The more problematic issue is, however, whether the ALJ's decision to reject Boulden's opinion in assessing Conwell's RFC is supported by substantial evidence. RFC is what an individual can still do despite his limitations.[7] SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id. See Myers v. Apfel*, 23 8F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered, and is based upon all of the relevant evidence in the case record. *Id.* at *3-5. The responsibility for determining a claimant's RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). The ALJ will

---

[6] The fifth factor, specialization of the treating physician, is not applicable to this case because neither party alleged that Boulden was a specialist. *See, e.g., Jeffcoat v. Astrue*, No. 4:08-CV-672-A, 2010 WL 1685825, at *3 (N.D. Tex. Apr. 23, 2010).

[7] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7.

In making an RFC assessment, the ALJ must consider all the symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p, 1996 WL 374184, at *5. The RFC assessment is based upon "*all* of the relevant evidence in the case record," including, but not limited to, medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original). The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.,* SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), superseded by SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

As to the ALJ's RFC determination, the absence of a medical source statement in the record describing the types of work that a claimant is capable of performing does not, in itself, make the record incomplete. *Ripley v. Chater,* 67 F.3d 552, 557 (5th Cir. 1995); *see Moreno v. Astrue,* 5:09-CV-123-BG, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010). However, evidence that merely describes the claimant's medical conditions is insufficient to support an RFC determination. *See id*; *see also Williams v. Astrue,* 355 F. App'x 828, 832 n.6 (5th Cir.

2009) ("In *Ripley*, we held that an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions.") The record must contain evidence of the effects the claimant's medical conditions have on her ability to work for the ALJ's RFC determination to be supported by substantial evidence. *Ripley*, 67 F.3d at 557 n.27.

In this case, the ALJ found that Conwell had the RFC to perform "a full range of sedentary work[8] duties." (Tr. 15.) In making this determination, the ALJ, as discussed above, rejected the opinions of Boulden, whose various RFC determinations indicated Conwell was not capable of the full range of sedentary work. In addition, the ALJ specifically rejected the RFC opinions of the SAMCs, claiming they were not supported by the evidence.[9] Instead, the ALJ relied on the following evidence: (1) evidence that one of the Western Blot tests taken on March 29, 2005 indicated Conwell tested positive for Lyme disease and her "Epstein-Barr virus panel was consistent with an old infection, but the rest of the comprehensive tests, including thyroid and liver functions, were generally within normal limits;" (2) Carrington's statement during an annual gynecological examination of Conwell on April 7, 2006 that Conwell, although suffering from chronic fatigue syndrome and a positive Lyme disease test, was considering another pregnancy, which, according to the ALJ, was "not consistent with a debilitating physical

---

[8] Sedentary work involves sitting for about six hours out of an eight hour work day and lifting items weighing no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a); *see* SSRs 96-9p, 1996 WL 374185, at *3 (S.S.A. July 2, 1996).

[9] The Court notes that the opinions of the SAMCs indicated that Conwell had the RFC to perform work at a higher exertional level than sedentary. However, the ALJ specifically stated he was rejecting their opinions on this issue. (Tr. 14.)

impairment;" (3) examination on March 28, 2005 in which Sharp noted that Conwell "had no cardiovascular or respiratory abnormality and her deep tendon reflexes were symmetrical, but there were no other observations relating to orthopedic, neuromuscular, sensory, or coordination abnormalities or deficits" and "the more recent, post-June 30, 2007 notes of 2008 are consistent with the critical period records;" (4) the June 15, 2006 cardiopulmonary exercise test in which Conwell achieved a score of 3.4 METS, which the ALJ claimed was not inconsistent with sedentary duties; and (5) the July 30, 2007 FCE in which Casper, a non-physician, noted that Conwell complained of pain and fatigue and became increasingly uncomfortable and frustrated during the evaluation but put forth good effort and performed at the medium exertion level. (Tr. 14-15.)

The problem with the ALJ's RFC analysis is that the evidence he relies on to support his RFC determination does not show that Conwell is capable of performing the full range of sedentary work. The Western Blot test that the ALJ relies on does not provide any evidence that Conwell is capable of performing sedentary work as it merely shows the laboratory results of a blood test. (Tr. 172.) In addition, Carrington's examination of Conwell was for a routine annual gynecological examination and Carrington did not provide any opinion regarding Conwell's ability to perform specific functions in a work setting. Furthermore, in his March 2005 examination, Sharp did not give any specific opinions on Conwell's functional limitations, if any, in the work place.

In addition, according to the June 15, 2006 cardiopulmonary exercise test itself, a METS score of 3.4 indicates a "severe impairment of the whole person" and a "poor prognosis." (Tr. 214.) The ALJ does not cite to any evidence or basis for his opinion that a METS score of 3.4 is

22

not inconsistent with sedentary duties. Furthermore, although the ALJ mentions the July 13, 2007 FCE that was performed by Casper in his decision, it does not appear that the ALJ actually relied on this evaluation as it found that Conwell was capable of performing work at the medium level.[10]

The only other evidence in the record that specifically indicates what effect Conwell's impairments had on her ability to work are: (1) Boulden's opinions, (2) the opinions of the SAMCs, and (3) Conwell's own testimony. The ALJ, however, chose not to rely on the opinions of Boulden or the SAMCs and only relied to a limited extent on Conwell's testimony. Instead, the ALJ's opinion indicates that he evaluated the medical data in the evidence of record and relied upon his own opinions to determine the significance or consistency of such records with the opinions of the treating and examining physicians. Because "the ALJ impermissibly relied on his own medical opinions" to determine the effects Conwell's conditions had on her ability to work, the ALJ's determination is not supported by substantial evidence. *Williams*, 355 F. App'x at 832; *see Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (stating that an ALJ must not "play doctor" and make his own independent medical assessments). *See also Helmer v. Astrue*, No. 1:07-CV-203-C, 2008 WL 4682552, at *4-5 (N.D. Tex. Oct. 22, 2008). Consequently, remand is required.[11]

---

[10] The Commissioner appears to agree with this conclusion as he states in his brief, "Although the ALJ did mention [the FCE] evaluation, he found she had a much more limited RFC, thus he did not give it any weight." (Def.'s Br. at 8.)

[11] Conwell also claims that the ALJ did not properly consider Conwell's fibromyalgia as a severe impairment even though Conwell was diagnosed with fibromyalgia on multiple occasions by multiple physicians. (Pl.'s Br. at 13.) Upon remand, the ALJ should consider whether Conwell's fibromyalgia is a severe impairment at Step Two or has an effect on any later step in the disability evaluation process.

23

## 2. Credibility

In her brief, Conwell argues that the ALJ improperly rejected her credibility and failed to properly evaluate her credibility pursuant to the two-step process set forth in 20 C.F.R. § 404.1529(b) & (c). (Pl.'s Br. at 15-16.) As to the two-step process for evaluating a claimant's credibility, Conwell claims that there "is no indication if [the ALJ] considered whether Ms. Conwell's medically determinable impairments could reasonably be expected to produce her alleged symptoms" as required by the first step in the process. (Pl.'s Br. at 15.) As to step two of the process, Conwell argues that the ALJ impermissibly "relied upon only a single factor enumerated in SSR 96-7p, Ms. Conwell's daily activities" in finding that Conwell's testimony was not credible and ignored the other relevant factors. (Pl.'s Br. at 16.)

In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 404.1529(b); SSR 96-7p, 1996 WL 374186, at *2. Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *2. A claimant's testimony must be consistent with the objective medical evidence and other available evidence. 20 C.F.R. § 404.1529. When assessing the credibility of an individual's statements, the ALJ considers, in addition to the objective medical evidence, the following: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of

any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 CFR § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3.

In all cases in which pain or other symptoms are alleged, the administrative decision must contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's own observations. SSR 95-5p, 1995 WL 670415, at *2 (S.S.A. Oct. 31, 1995). A claimant's statements about pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C. § 423(d)(5)(A). An ALJ's unfavorable credibility evaluation will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's subjective complaints. *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988); *see Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

Contrary to Conwell's claims, the ALJ did not reject Conwell's credibility. In fact, the ALJ found that Conwell's testimony and other statements were generally credible but they did not support the conclusion that she was incapable of performing any level of sustained work

25

activity. (Tr. 17.) In addition, the ALJ properly evaluated Conwell's credibility pursuant to the two-step credibility evaluation set forth in the regulations and SSRs. To begin with, the ALJ, pursuant to the first step of the credibility analysis, did consider whether Conwell had a medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. In his decision, the ALJ specifically stated, "I find that the objective medical evidence establishes that claimant had medically determinable, severe impairments throughout the critical period that were capable of producing the type of subjective complaints she expressed." (Tr. 12.)

In the second step of the credibility analysis, the ALJ, citing to 20 C.F.R. § 404.1529 and SSR 96-7p, specifically stated:

> In addition to the testimony and objective medical facts/opinions, I considered other relevant factors, including but not limited to (1) claimant's daily activities; (2) the location, duration, frequency and intensity of her subjective complaints; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side-effects of medication; (5) the prescribed treatment regimen; and (6) any other palliative measures she may use.

(Tr. 13.) As to factor one, the ALJ reviewed Conwell's daily activities, finding that Conwell was able to drive, shop, take general care of her home and daughter, and occasionally volunteer to teach bible studies. (Tr. 13.) As to factor two, the ALJ noted that Conwell testified she had been experiencing chronic pain since before her alleged onset date and it "strikes at random times in different parts of her body." (Tr. 13.) The ALJ also stated, "Claimant added her thighs and hips are frequent targets, with pain and stiffness deep into the joints, and fatigue is constant problem, although some days are better than others," and he noted that Conwell testified she can sit for two to three hours, cannot stand for very long, and has to rest after walking a couple of blocks.

(*Id.*) As to factor three, the ALJ indicated that Conwell had testified that all exertional activities and strenuous postural movements were aggravating. (*Id.*) As to factors four, five, and six, the ALJ recognized that Conwell had taken various medications, vitamins, and natural supplements, which could cause adverse side effects such as anxiety, drowsiness, and irritability and that Conwell preferred to control her impairments through nutrition, diet, and mild exercise because her system was sensitive to medication. (*Id.*) Because the ALJ properly went through the two-part test in evaluating Conwell's credibility and the ALJ adequately explained the weight he assigned to her subjective complaints, the Court concludes that the ALJ did not err in evaluating Conwell's credibility.

### 3. Application of Medical-Vocational Guidelines

Conwell also argues that the ALJ erred in applying the Medical-Vocational Guidelines ("GRIDS")[12] at Step Five of the disability evaluation process in determining that she was not disabled. (Pl.'s Br. at 17.) Conwell claims that it was improper for the ALJ to rely on the GRIDS because of Conwell's "numerous non-exertional limitations, including frequent limitations noted to be due to chronic pain and fatigue." (*Id.*) Conwell claims that the ALJ

---

[12] The GRIDs provide an analysis of the various vocational factors such as age, education and work experience in combination with the individual's residual functional capacity for work in evaluating a claimant's ability to engage in substantial gainful activity. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 200.00. Where findings of fact coincide with all the criteria of a particular rule, the rule directs a conclusion as to whether the claimant is or is not disabled. *Id.* The GRIDS are to be used when a claimant has an impairment that causes the claimant to have limitations in meeting the strength requirements for a job. The GRIDS may not be fully applicable where the nature of a claimant's impairment is nonexertional, such as when a claimant has certain mental, sensory, or skin impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 200.00(e). The Fifth Circuit has held that the use of the GRIDS is appropriate when a claimant suffers only from exertional impairments or a claimant's nonexertional impairments do not significantly affect his RFC. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999); *Carry v. Heckler*, 750 F.2d 479, 483 n.9 (5th Cir. 1985). When the claimant has a nonexertional factor that limits the range of jobs a claimant can perform, the ALJ cannot rely on the GRIDS and must rely on vocational expert testimony to establish that jobs exist. *Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). *See also Bolton v. Callahan*, 984 F. Supp. 510, 513-14 (N.D. Tex. 1997); *Frazier v. Chater*, 903 F. Supp. 1030, 1034 (N.D. Tex. 1995).

should have instead relied upon the testimony from the Vocational Expert, who testified that Conwell was unable to perform any of her past relevant work or other work in the national economy and was, thus, disabled. (*Id.*)

In light of the Court's recommendation that this matter be remanded as previously set forth herein, the Court does not express a ruling on this issue. Upon remand, the ALJ's analysis and decision will determine the appropriateness of the ALJ's reliance on the GRIDS at Step Five of his decision.

## RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with these proposed findings and conclusions.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until **November 30, 2010**. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon

grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until **November 30, 2010** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED November 9, 2010.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE